Filed 10/2/14  P. v. Lewis CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>WILLIE THEOPHUS LEWIS,<br><br>  Defendant and Appellant. | B248822<br><br>(Los Angeles County<br>Super. Ct. No. NA090862) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Mark C. Kim, Judge.  Affirmed in part, reversed in part, and remanded for resentencing.

Benjamin Owens, under appointment by the Court of Appeal, for Defendant and Appellant Willie Theophus Lewis.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Zee Rodriguez and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Following a jury trial, appellant Willie Theophus Lewis, was convicted of making criminal threats (Pen. Code, § 422, count 1),[1] false imprisonment by violence (§ 236, count 2), domestic violence causing traumatic injury (§ 273.5, subd. (a), count 3), misdemeanor battery (§ 243, subd. (e)(1), count 4), and dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1), count 5). The trial court sentenced appellant to a total of four years and eight months in state prison. The court selected count 3 as the base term and imposed the middle term of three years on that count, one year consecutive on count 2, and eight months consecutive on count 5. The court imposed a six-month sentence on count 4 to run concurrently with the principal count, and stayed the sentence on count 1 pursuant to section 654.

Appellant contends the trial court committed instructional error in failing to give CALJIC No. 2.80 sua sponte on the evaluation of expert testimony and failed to exercise its discretion to impose concurrent rather than consecutive sentences. Appellant also seeks review of the trial court's in camera hearing pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). We affirm the judgment of conviction. But we reverse as to sentence and remand for resentencing.

## FACTS

**Prosecution Case**

Appellant and Taeaone F. were married but separated in April 2011. At approximately 5:00 p.m. on December 13, 2011, appellant took divorce papers to Taeaone's parents' house in Long Beach where Taeaone was living. Appellant left before Taeaone signed them and said he would return later. Appellant returned at approximately 8:00 p.m. and sent Taeaone a text message asking her to come outside. Taeaone got inside appellant's car and they talked about the divorce papers. Taeaone assumed they would drive around the block while talking but appellant drove onto the freeway. He exited the freeway and parked near the aquarium. Appellant got angry

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

2

when they started talking again and Taeaone asked him to take her home. Appellant refused. When Taeaone tried to get out of the car, appellant told her he had a gun and he would shoot her and anyone who tried to help her.

Appellant started driving again, and Taeaone tried to get out when they approached a red light but was unsuccessful. Appellant said he was going to shoot Taeaone and himself. He said he had a blanket and pillow in the car that would muffle the gunfire. Appellant's mother and sister called him to try "to convince him not to do anything stupid." Appellant held a gun to Taeaone's head. Taeaone was scared and pleaded with appellant to let her go. Appellant wanted to know the address of a man Taeaone dated while she and appellant were separated. Appellant said "he was going to try to find this guy and that he was going to kill him and leave him on the doorstep so his family could see him."

Appellant drove to the apartment building where the man Taeaone dated used to live. He told Taeaone to get out of the car and show him where the man lived. When Taeaone insisted the man did not live there, appellant hit her in the face with his left hand. He was holding his phone in his hand when he struck her and her nose began to bleed and got puffy. Appellant pulled Taeaone from the car and walked towards the apartment complex dragging her by the arm and threatening to shoot her. Taeaone tripped and fell, scraping her hands and elbow. Appellant continued walking towards the apartments. Taeaone seized the opportunity to escape and walked back towards the street and contacted a motorist for help.

Abhisek Kumar was sitting in his car outside the apartment building. Taeaone got into the passenger seat of Kumar's car. She was very scared and asked Kumar to drive her to the nearest police station. Taeaone used Kumar's cell phone to call her sister Tamar F. and asked her to meet her and pick her up. From the police station, Tamar called Taeaone's brother Olataga F. and told him what happened. At the police station Taeaone told the officer that she was "trying to get away from [appellant] because he had

3

a gun and he was trying to kill [her]." An emergency protective order was issued which prohibited appellant from having any contact with Taeaone for seven days.

Olataga was at the family home where Taeaone had earlier left her cell phone. He looked at it and saw that appellant had been sending threatening text messages telling Taeaone to come outside or he would come inside. Olataga went outside and saw appellant standing by the neighbor's wall approximately 20 to 25 feet from where Olataga was standing. Olataga went back inside, locked the door, and called 9-1-1. At approximately 1:15 a.m. Long Beach Police Officer Cory Lapworth found appellant across the street from Taeaone's parents' house. Appellant was arrested and transported to the police station.

The following day appellant placed several calls to Taeaone, which were recorded pursuant to an announced, blanket policy of recording all outgoing telephone calls by jail inmates. The prosecutor obtained recordings of the calls and the trial court denied a motion to suppress. Appellant tried to get Taeaone to say she made up the allegations because she was mad. During one telephone call, appellant told Taeaone that if she did not appear for trial, or if she "dropped the case" the prosecutor would drop the charges. During another call Taeaone said she did not want appellant to stay in jail but she also did not want something bad to happen to her if he was released. Appellant promised he would not do anything to her and that she did not have to forgive him. He wanted her to "help [him] get outta here and deal with it." Taeaone obtained a restraining order on December 16, 2011, and appellant violated it by repeatedly calling her and trying to convince her to recant her statements. In another recorded telephone call from jail, appellant told Taeaone to get a notarized letter in which she stated she fabricated the allegations against him because she was suffering from post-partum depression.

Detective Michael Hubbard, a 14-year veteran of the Long Beach Police Department, and an experienced domestic violence investigator, interviewed Taeaone a few days after the incidents. She was reluctant to speak about what happened but did tell Detective Hubbard that what she told the officers the night of the incident was accurate.

4

She told him she was afraid to testify against appellant in court and she did not believe a restraining order would prevent appellant from killing her if he got out of jail. At the preliminary hearing Taeaone testified that she did not remember a lot of details of the incidents on the night of December 13, 2011. At trial, she testified that at the time of the preliminary hearing she still loved appellant and hoped things could work out.

In April 2012, appellant falsely accused Taeaone of welfare and tax fraud. On April 25, 2012, appellant left Taeaone a voicemail message saying he was not trying to hurt her but had to "discredit" her. He said she would not get in trouble and the "worst case scenario" was that she would have to pay a fine and he would pay her back when he got out of jail. That was the "last straw" for Taeaone, and the next time appellant called her, she told him she did not want to speak to him again.

Prior to the incidents on the night of December 13, 2011, there had been a previous incident of domestic violence involving appellant and Taeaone. In December 2010, appellant woke Taeaone, dragged her into the bathroom and after using water to wake her up, dragged her out into the street. Appellant took off his belt and used it to strike Taeaone on the legs. She suffered injuries. She did not report the incident to the police but did tell family members.

Detective Hubbard testified that in his experience it was common for victims of domestic violence to continue to speak with their abusers after their arrest because they still had feelings for them. Many times the victims were afraid of the suspect and felt they had to maintain communication. Victims generally reported incidents at the time they occurred but it was common for them to be reluctant to speak to detectives in follow-up interviews Often, victims were afraid of what might happen to them if they continued to pursue the case against their abusers and many of them recanted their statements and reconciled with their abusers.

**Defense Case**

Appellant testified on his own behalf. He said he went to Taeaone's parents' house to have her sign divorce papers. Taeaone had to go to school and asked appellant

5

to come back later to discuss the divorce. When he returned, Taeaone got in his car and he drove away. Appellant parked at the beach and he and Taeaone smoked cigarettes and listened to the car radio. They argued and appellant suspected Taeaone was cheating on him and asked her how long it had been going on. When Taeaone refused to answer appellant, he told her to get out of the car. He told her he wanted sole custody of their child if they divorced. Appellant testified Taeaone wanted them to reconcile.

Taeaone told appellant she had cheated on him with someone named Kareem. Appellant wanted to know where Kareem lived so he could beat him up. They drove to an apartment complex where Taeaone believed Kareem lived. They argued in front of the apartment complex but appellant testified that he did not hit, drag, or pull Taeaone. Appellant testified that he reported his gun stolen years earlier and he did not have a gun with him that night. He went to look for Kareem, and when he returned, Taeaone was gone. Appellant searched for Taeaone and when he could not find her, he drove to her parents' house. Appellant denied hitting or threatening to kill Taeaone. He said he intended to end their marriage and did not threaten to commit suicide. Appellant explained that he was trying to get Taeaone to tell the truth during the recorded jail telephone calls because she had fabricated the charges against him. He never told her to lie or to not appear in court.

Appellant's mother, Ether Peterson, testified that on December 13, 2011, Taeaone called her and asked her to come and get "all three of us" because they needed to stay with her for a while. Appellant got on the phone and told her not to come. She did not hear him threaten to commit murder or suicide. Peterson acknowledged that before she spoke with the police, appellant called her from jail and told her what he had told the police about their telephone call earlier that night.

Long Beach Police Officer James Mondragon arrived at Taeaone's parents' house as appellant was being arrested. He saw a car drive by that matched the description of the car involved in the offenses against Taeaone. He stopped the car which was driven by an

6

individual named Roy Lewis.  No gun, blanket, or pillow were found in a search of the car.

**Prosecution Rebuttal Case**

Detective Hubbard testified that when he first contacted Peterson on December 15, 2011, she indicated she was not aware of what happened between appellant and Taeaone and did not want to be involved in the case.

## DISCUSSION

**I.      The Jury Was Properly Instructed on How to Evaluate Expert Testimony**

Appellant contends the trial court erred in failing to instruct the jury sua sponte with CALJIC No. 2.80[2] after allowing Detective Hubbard to testify as to certain behaviors of domestic violence victims.

CALJIC No. 2.80 instructs the jury as to how to evaluate expert testimony and informs the jury that it is not bound by expert testimony, but may give such testimony whatever weight the jury feels it deserves.  The instruction must be given sua sponte when expert opinion testimony has been introduced.  (§ 1127b; see also *People v. Bowens* (1964) 229 Cal.App.2d 590, 600, overruled on another ground in *People v. Mayberry* (1975) 15 Cal.3d 143, 158.)

The prosecutor qualified Detective Hubbard as an expert on domestic violence and elicited his testimony that it was common for abuse victims to continue to communicate

---

[2]      CALJIC No. 2.80 states:  "[A witness] [Witnesses] who [has] [have] special knowledge, skill, experience, training or education in a particular subject [has] [have] testified to certain opinions.  This type of witness is referred to as an expert witness.  In determining what weight to give to any opinion expressed by an expert witness, you should consider the qualifications and believability of the witness, the facts or materials upon which each opinion is based, and the reasons for each opinion.  [¶]  An opinion is only as good as the facts and reasons on which it is based.  If you find that any fact has not been proved, or has been disproved, you must consider that in determining the value of the opinion.  Likewise, you must consider the strengths and weaknesses of the reasons on which it is based.  [¶]  You are not bound by an opinion.  Give each opinion the weight you find it deserves.  You may disregard any opinion if you find it to be unreasonable."

with their abusers, it was common for abuse victims to be reluctant to give details to detectives in follow-up interviews, and it was common for abuse victims to recant their allegations of abuse.

Despite having permitted Detective Hubbard to testify as an expert, the trial court failed to instruct the jury with CALJIC No. 2.80. "[F]ailure to instruct on the weight of expert testimony is not prejudicial unless the reviewing court, upon an examination of the entire cause, determines that the jury might have rendered a different verdict had the omitted instruction been given." (*People v. Reeder* (1976) 65 Cal.App.3d 235, 241 (*Reeder*).) Taking the instructions given as a whole, the jury was adequately informed on how to evaluate expert testimony and the failure to give CALJIC No. 2.80 was harmless.

A claim of instructional error is reviewed de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.) The proper test for judging the adequacy of instructions is to decide whether the trial court "fully and fairly instructed on the applicable law . . . ." (*People v. Partlow* (1978) 84 Cal.App.3d 540, 558.) "'In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. ['] [Citation.]" (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338.) "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." (*People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258.)

Although the trial court did not instruct with CALJIC No. 2.80, it did give the jury CALJIC No. 2.20, which cautioned jurors to act as the sole judge of a witness's believability and the weight to be given each witness's testimony, including the "existence or nonexistence of any fact testified to by the witness." The court also instructed the jury with CALJIC Nos. 2.21.2 (witness willfully false) and 2.27 (sufficiency of testimony of one witness). Thus, the jury was well aware of its duty to assess the credibility and probative value of every aspect of Detective Hubbard's

testimony.  Absent an indication to the contrary, we presume the jury followed the court's instructions.  (*People v. Gray* (2005) 37 Cal.4th 168, 217.)

Contrary to appellant's contention, this case is not like *Reeder, supra,* 65 Cal.App.3d 235, where the appellate court concluded the trial court's failure to instruct sua sponte on the evaluation of expert witness testimony constituted prejudicial error.  In *Reeder,* the victim and defendant gave conflicting accounts at trial with regard to charges of forcible rape and sex perversion.  (*Id.* at p. 238.)  The parties stipulated to the administration of polygraph examinations of the defendant and the victim.  At trial, the two polygraph experts testified for the People, one opining that the defendant had been untruthful in his account of the incident during his polygraph examination and one opining that the victim had been truthful in responding to questions during her polygraph examination.  (*Id.* at p. 239.)  In concluding the failure to instruct on the evaluation of expert witness testimony constituted prejudicial error, the appellate court noted that both witnesses specifically had testified as experts for the People and, through their testimony, which was not subject to cross-examination or rebuttal, "tended to enshroud the practice of polygraphy in an aura of infallibility," when "polygraph evidence is considered by the great weight of authority to be so unreliable as to be inadmissible without a stipulation." (*Id.* at p. 242; see *id.* at p. 244.)  Here, in contrast, there was strong evidence corroborating Taeaone's version of events and it was not simply her word against appellant's word.  Furthermore, Detective Hubbard did not testify to a matter that is considered universally unreliable.

Appellant's reliance on *United States v. Freeman* (9th Cir. 2007) 498 F.3d 893 (*Freeman*) is also unavailing.  There, a drug enforcement agent testified as both a lay witness and as an expert on the meaning of certain jargon known only to those with specialized knowledge of the drug trade.  But the appellate court found the agent erroneously testified as an expert when he interpreted ambiguous statements not involving drug jargon, based only on his general knowledge of the investigation.  (*Id.* at p. 902.)  The court noted the difficulties that may arise when a witness testifies to lay

9

observations and as an expert: the witness's aura of expertise may move the jury to grant the expert witness unmerited credibility when testifying about factual matters; a failed effort to impeach the witness as an expert may enhance the witness's credibility in testifying as a lay witness; an increased risk the expert will stray from reliable methodology and engage in sweeping conclusions, and the risk of juror confusion in discerning whether the expert is basing an opinion on reliable methodology or on personal knowledge of the case. (*Id.* at p. 903.)

This case does not involve the erroneous admission of evidence. Appellant did not object in the trial court, and does not argue here, that Detective Hubbard was unqualified to offer his opinions, or that his testimony on domestic violence in general, or about Taeaone and appellant in particular, was objectionable. Nor does he assert the officer provided inadmissible lay or factual testimony. Accordingly, unlike the situations in *Reeder* and *Freeman,* the instructions given in this case on evaluating witnesses generally were sufficient for the jury to evaluate Detective Hubbard's testimony.

CALJIC No. 2.80 would have added nothing of significance to the jury's evaluation of the case. There is no likelihood that the jury would have rendered a verdict more favorable to appellant had CALJIC No. 2.80 been given, and any error was unquestionably harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

## II.     The Trial Court Properly Exercised Its Discretion to Impose Consecutive Sentences

Appellant contends remand for resentencing is warranted because the trial court misunderstood its sentencing discretion.[3] He contends the court believed it had to impose consecutive sentences pursuant to section 667, subdivision (c). Alternatively, appellant contends that his trial counsel was ineffective at sentencing.

---

[3]     We remand for resentencing because of unauthorized sentences imposed for counts 2 and 5 (see part III, *post.*), but not because the trial court misunderstood its sentencing discretion.

10

### A. Proceedings Below–Sentencing Hearing

Defense counsel argued for probation or alternatively for the low term on one count and concurrent terms on all other counts. The prosecution's sentencing memorandum recommended that appellant be sentenced to a term of six years, four months in state prison and an additional six months in county jail. The prosecutor agreed that count 1 was subject to section 654 but argued that under section 667, subdivision (c)(6),[4] consecutive terms were mandatory (for counts 2, 3, and 5) because appellant had been convicted of two serious felonies (counts 1 and 5) that were not committed on the same occasion and did not arise from the same set of facts. The prosecutor pointed out that this argument was not included in the prosecutor's sentencing memorandum. Defense counsel agreed that count 5 should be consecutive but argued that "all the rest should be run concurrent on 654." The court disagreed with defense counsel's argument and stated that only counts 1 and 2 arose from the same act. The court proceeded to impose consecutive sentences on counts 2, 3, and 5.

### B. Relevant Legal Principles

California Rules of Court, rule 4.425(a)(1) and (3) provide, respectively, that in imposing a consecutive or concurrent sentence, the trial court considers whether "[t]he crimes and their objectives were predominantly independent of each other" and "committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior."

Trial courts have broad sentencing discretion in choosing between concurrent and consecutive sentences. (*People v. Bradford* (1976) 17 Cal.3d 8, 20.) We review the trial

---

[4]     Section 667, subdivision (c)(6) provides, "Notwithstanding any other law, if a defendant has been convicted of a felony and it has been pled and proved that the defendant has one or more prior serious and/or violent felony convictions as defined in subdivision (d), the court shall adhere to each of the following: . . . [¶] (6) If there is a current conviction for more than one felony count not committed on the same occasion, and not arising from the same set of operative facts, the court shall sentence the defendant consecutively on each count pursuant to subdivision (e)."

11

court's decision for abuse of discretion.  (*People v. Birmingham* (1990) 217 Cal.App.3d 180, 185–186.)

### C.    Analysis

The court in *People v. Scott* (1994) 9 Cal.4th 331, 353–356, held that challenges to a sentencing choice must first be raised in the trial court or the issue will be deemed waived on appeal.  Appellant did not raise this issue in the trial court, and the issue has been waived.  However, because appellant asserts his counsel was ineffective for failing to object, we address the merits of his claim.

Appellant does not argue that the court's sentencing choice was an abuse of discretion or that there could be no factual support for a finding that his crimes were committed on separate occasions.  Appellant suggests that the trial court was misled by the prosecutor's argument and therefore mistakenly believed that consecutive sentencing was mandated under section 667, subdivision (c)(6).

Section 667, subdivision (c)(6) applies only where a defendant is convicted of multiple felonies and it has been pled and proven that he had one or more prior serious and/or violent felony convictions.  (*People v. Casper* (2004) 33 Cal.4th 38, 42.)  No prior serious or violent felony convictions were pled or proven and accordingly the mandatory consecutive sentencing addressed in section 667, subdivision (c)(6) did not apply to appellant.  We presume the trial court was aware of and followed the applicable law in imposing sentence.  (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496.)  In order to overcome this presumption, appellant must affirmatively demonstrate error.  (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)  Appellant has not met this burden.

To the contrary, a number of facts demonstrate the court was aware of its discretion.  The trial court's comment that the prosecutor was "recommending that defendant get six years, four months" prior to the prosecutor's argument, indicates that the court had read the prosecution's sentencing memorandum which contained no reference to section 667, subdivision (c)(6).  The court never commented on or indicated in any way it agreed with the prosecutor's argument that section 667, subdivision (c)(6)

12

was applicable here. The court entertained defense counsel's argument for concurrent sentencing immediately after the prosecutor's reference to section 667, subdivision (c)(6), without stating that it lacked the authority to impose concurrent terms. Furthermore, we can presume the court considered the relevant criteria in the California Rules of Court in deciding whether to impose consecutive or concurrent sentences (Cal. Rules of Court, rule 4.425), because the court disagreed with defense counsel's analysis and referenced that the crimes involved separate acts.

There is no reason to suspect the trial court was unaware of its authority or its discretion to determine whether sentences were to run concurrently or consecutively. We reiterate, in the absence of a clear showing of abuse, we may not disturb the court's exercise of its discretion. Considering all the circumstances, the court's sentencing decision did not exceed the bounds of reason. (*People v. Bradford, supra,* 17 Cal.3d at p. 20.)

In sum, appellant's claim of error that the trial court misunderstood its sentencing discretion fails. We therefore need not address whether appellant forfeited the point by failing to raise it in the trial court or the further assertion defense counsel rendered ineffective assistance in failing to raise the issue below.

## III. Sentencing Error

### A. *Count 2–False Imprisonment by Violence*

Appellant contends, the People agree, and we concur that the trial court erroneously imposed a one-year term on count 2, when the correct term was eight months.

The prosecutor's sentencing memorandum stated that the range of sentences for count 2 was two years, three years, or four years. The prosecutor confirmed this range when the trial court inquired at the sentencing hearing. The trial court imposed a one-year term on count 2, believing one year to be one-third the middle term. However, false imprisonment by violence is punishable by 16 months, two years, or three years. (§§ 237, 1170, subd. (h)(1).) Therefore, the middle term is actually two years and one-

13

third of the middle term is eight months.

The imposition of a term not specified by the Penal Code is an unauthorized sentence that may be corrected at any time. (*People v. Massengale* (1970) 10 Cal.App.3d 689, 693.)

### B.  *Count 5–Dissuasion of a Witness*

The People argue that the trial court was required to impose the full middle term, not one-third of the middle term, for the consecutive sentence imposed on count 5 for appellant's conviction of dissuasion of a witness in violation of section 136.1, subdivision (b)(1).  The People are correct.

Section 1170.15 provides:  "Notwithstanding subdivision (a) of Section 1170.1 which provides for the imposition of a subordinate term for a consecutive offense of one-third of the middle term of imprisonment, if a person is convicted of a felony, and of an additional felony that is a violation of Section 136.1 or 137 and that was committed against the victim of, or a witness or potential witness with respect to, or a person who was about to give material information pertaining to, the first felony . . . the subordinate term for each consecutive offense that is a felony described in this section shall consist of the full middle term of imprisonment for the felony for which a consecutive term of imprisonment is imposed, . . . ."

Section 1170.15 applies "when a defendant is convicted of a felony (the 'first felony') and also convicted of dissuading or attempting to dissuade the victim of, or a witness to, the first felony from reporting or giving testimony regarding the first felony." (*People v. Evans* (2001) 92 Cal.App.4th 664, 669.)  "Section 1170.15 does not create an enhancement, but an alternative sentencing scheme." (*People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1835.)  Accordingly, "section 1170.15 need not be specifically pleaded and proven." (*Ibid.*)

The application of section 1170.15 does not require any additional jury fact finding.  It applies whenever a jury finds a defendant guilty of a felony and of dissuading a victim of, or witness to, that felony.  The trial court here found that appellant's

14

conviction for dissuading a witness was related to the other offenses including the domestic violence offense. There is substantial evidence here for the conclusion that the dissuading a victim offense related to the other charges in this case. Taeaone testified that she received numerous telephone calls from appellant while he was in jail awaiting trial. Recordings of the jailhouse calls were played for the jury. The record shows that appellant's threats of dissuading Taeaone from testifying related to the specific offenses charged in the present case. Section 1170.15 is applicable in the present case because the jury convicted defendant of felony domestic violence causing traumatic injury, criminal threats, battery, false imprisonment, and dissuading the victim.

Appellant does not deny that section 1170.15 requires the full middle term for a violation of section 136.1. He does argue, however, that double jeopardy protects appellant from a greater sentence on remand. The People on the other hand, argue a remand in this case is unnecessary and urge this Court to correct the error.

We may set aside an unauthorized sentence so a proper sentence may be imposed, even if the new sentence is harsher. (*People v. Delgado* (2010) 181 Cal.App.4th 839, 854.) Under section 1170.15, the trial court retains discretion to impose a consecutive or concurrent term for the offense of dissuading a witness. As discussed above (see part II, *ante*.), there is no reason to suspect the trial court was unaware of its discretion to determine whether sentences were to run concurrently or consecutively. However, given the fact that the trial court could impose a lengthier aggregate sentence than that originally imposed, the matter must be remanded so that the trial court may exercise its discretion where appropriate. (See *People v. Irvin* (1991) 230 Cal.App.3d 180, 192-193 ["As a result of the trial court's imposition of an unauthorized sentence, the appropriate course of action is to remand this case to the trial court" to exercise its discretion in resentencing]; *People v. Calderon* (1993) 20 Cal.App.4th 82, 88 ["It is perfectly proper for this court to remand for a complete resentencing after finding an error with respect to part of a sentence . . . ."].) We express no opinion as to how the trial court should exercise its discretion in sentencing.

15

## IV.    The *Pitchess* Motion

Appellant also requests that we independently review the sealed transcript of the in camera proceedings on his *Pitchess* motion, which we have done.  The trial court's findings during that review, as reflected in the sealed transcript, were sufficient to permit appellate review of its ruling.  (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229, 1232.)  We find no error in the trial court's ruling at the in camera hearing.

## DISPOSITION

The judgment of conviction is affirmed, but the sentence is reversed.  The matter is remanded to the trial court for resentencing.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J. *

                            FERNS

We concur:


_____, Acting P. J.

        ASHMANN-GERST


_____, J.

        CHAVEZ

_____

\*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.